UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ASHTON RUTHERFORD                                    CIVIL ACTION

VERSUS                                               NO. 23-2570

PONTCHARTRAIN                                        SECTION M (1)
MATERIALS CORP., LLC, *et al.*

## ORDER & REASONS

Before the Court is a motion for summary judgment on seaman status filed by defendant

Pontchartrain Materials Corporation, LLC ("Pontchartrain").[1]   Plaintiff Ashton Rutherford

responds in opposition,[2] and Pontchartrain replies in further support of its motion.[3]   Having

considered the parties' memoranda, the record, and the applicable law, the Court grants the motion

because Rutherford does not satisfy the test for seaman status established by the Supreme Court in

*Chandris, Inc. v. Latsis,* 515 U.S. 347 (1995), and the Fifth Circuit in *Sanchez v. Smart Fabricators*

*of Texas, L.L.C.*, 997 F.3d 564 (5th Cir. 2021) (en banc).

## I.    BACKGROUND

This case concerns a maritime personal injury.   Pontchartrain is a supplier of aggregate

construction materials, such as crushed stone, limestone, concrete, sand, and gravel.[4]   It operates

four aggregate yards in southeast Louisiana where its marine department unloads the aggregate

from third-party-owned hopper barges to shore.[5]   Pontchartrain owns and operates three spud

barges – the *Leviathan*, the *Behemoth*, and the *Pouledeau* – that are used in conjunction with the

---

[1] R. Doc. 19.
[2] R. Doc. 28.
[3] R. Doc. 30.
[4] R. Doc. 19-1 at 2.
[5] *Id.* at 2-3.

material handling work.[6]  For an unloading operation, Pontchartrain's barge is spudded down or tied to shore and connected to land by a gangplank for the duration of the operation.[7]  Then, a third-party-owned hopper barge full of aggregate material is placed alongside Pontchartrain's spud barge and Pontchartrain employees use an excavator or front-end loader to unload the aggregate material from the material barge and place it in a dump truck or a pile on land.[8]  To be clear, Pontchartrain does not own or operate the aggregate material barges.[9]  During the unloading operations, Rutherford worked on the third-party-owned-and-operated material barges signaling the crane operator, or using a front-end loader, to move the aggregate.[10]  When an unloading operation was complete, the Pontchartrain spud barge was moved by a third-party-owned tugboat to its next work location.[11]  Pontchartrain employees do not usually ride a spud barge to its next location, but have done so on rare occasions, for a short time or to cover a short distance.[12]

Pontchartrain employed Rutherford as a loader operator and oiler on its spud barges.[13]  He was primarily assigned to work on the *Behemoth* at various of Pontchartrain's aggregate yards.[14]  Pontchartrain's shoreside operations manager assigned Rutherford's work locations and told him where to report each day.[15]  Rutherford drove to the assigned aggregate yard for each shift and returned home every night.[16]  He boarded the Pontchartrain spud barges by ladder or tow boat, but did not sleep on or sail with any vessel.[17]  Rutherford performed some maintenance on the

---

[6] R. Docs. 19-1 at 3; 28 at 2.
[7] R. Doc. 19-1 at 3.
[8] *Id.* at 4.
[9] *Id.*
[10] R. Doc. 28 at 3.
[11] R. Doc. 19-1 at 4.
[12] *Id*.
[13] R. Docs. 1 at 4; 28 at 2.
[14] R. Docs. 19-1 at 4-5; 28 at 2.
[15] R. Docs. 19-1 at 5; 28 at 3.
[16] R. Doc. 19-1 at 5.
[17] R. Docs. 19-1 at 5; 28 at 3.

*Behemoth* and other spud barges, such as fueling and greasing the excavators, cranes, and front-end loaders.[18]   He was also responsible for spudding down and cleaning Pontchartrain's spud barges and tying up the third-party-owned material barges to them.[19]   Additionally, Rutherford unloaded material barges or assisted his supervisor and the *Behemoth*'s captain, Norwood Favre, in unloading operations.[20]   Rutherford estimates that he spent 80-to-90 percent of his time with Pontchartrain working on water.[21]

On June 15, 2022, Rutherford reported to Pontchartrain's aggregate yard in Belle Chasse, Louisiana, to assist Favre with unloading limestone from a material barge.[22]   Because the *Behemoth* was in drydock and the cables that would have moved the front-end loader onto the third-party-owned material barge were on it, Favre operated the excavator from shore and Rutherford "spotted" Favre from the material barge, using hand signals to indicate where inside the barge Favre should place the excavator's bucket to unload the limestone.[23]   The material barge was moved several times that day, and each time, Rutherford would have untied and retied it to the shore.[24]   Operating the excavator, Favre repetitively picked up the limestone in the material barge and then swung the excavator's bucket to a nearby dump truck to deposit it.[25]   At some point during a bucket swing, Favre allegedly hit Rutherford on the right elbow with the bucket causing him to fall into the canal.[26]   The crew of a nearby, third-party tugboat retrieved Rutherford from the water.[27]

---

[18] R. Docs. 19-1 at 5-6; 28 at 2-3.
[19] R. Doc. 28 at 3.
[20] R. Docs. 19-1 at 5-6; 28 at 2-3.
[21] R. Doc. 28 at 4.
[22] R. Doc. 19-1 at 6.
[23] R. Docs. 19-1 at 6; 28 at 4.
[24] R. Doc. 28 at 4-5.
[25] R. Doc. 19-1 at 6.
[26] *Id.*
[27] R. Docs. 19-1 at 6-7; 28 at 5.

On July 18, 2023, Rutherford filed this suit asserting claims of Jones Act negligence, unseaworthiness, and maintenance and cure.[28]  Rutherford also alleges, in the alternative, a claim under the Longshore and Harbor Workers' Compensation Act ("LHWCA").[29]

## II.    PENDING MOTION

Pontchartrain filed the instant motion arguing that the undisputed evidence shows, as a matter of law, that Rutherford worked for Pontchartrain as a longshoreman, not a Jones Act seaman.[30]  Pontchartrain contends that Rutherford cannot satisfy the seaman test explained in *Sanchez*, 997 F.3d at 569-74, and applied by this Court in *Meaux v. Cooper Consolidated, LLC*, 601 F. Supp. 3d 38, 49-54 (E.D. La. 2022).[31]  Pontchartrain argues that Rutherford was a longshoreman, primarily engaged in loading and unloading third-party-owned material barges, who never served as a member of a vessel's crew, never went to sea or offshore, always worked very close to land, and drove himself to and from work every day.[32]  Pontchartrain further argues that Rutherford owed his allegiance to it, a shoreside employer that determined his work schedule and location, not a vessel or identifiable fleet of vessels under common ownership.[33]  According to Pontchartrain, because Rutherford is not a Jones Act seaman, his claims for negligence, unseaworthiness, maintenance and cure, and punitive damages for failure to pay maintenance and cure must be dismissed, leaving him only with his remedy under the LHWCA.[34]

In opposition, Rutherford argues that he meets the seaman test because he contributed to the mission and function of Pontchartrain's fleet of spud barges with a connection that was

---

[28] R. Doc. 1 at 1-14.  Rutherford also sued Favre and Canal Barge Company, Inc., but his claims against those defendants have been dismissed.  R. Docs. 14; 29.
[29] R. Doc. 1 at 13.
[30] R. Doc. 19.
[31] R. Doc. 19-1 at 1-2.
[32] *Id.* at 7, 12-17.
[33] *Id.* at 12-13, 16.
[34] *Id.* at 16-17.

substantial in both its duration and its nature.[35]  As to the vessels' mission and function, Rutherford argues that his maintenance work on Pontchartrain's spud barges and his unloading work on the third-party-owned material barges helped Pontchartrain's spud barges accomplish their loading and unloading mission.[36]  Rutherford contends that his testimony, along with Farve's testimony, satisfies the duration element of the seaman test by showing that he spent at least 50 percent of his working time in service of the spud barges – well in excess of the 30 percent rule of thumb.[37]  With respect to the three *Sanchez* factors addressing the nature element, Rutherford posits that: (1) he owed his allegiance to both Pontchartrain and the spud barges because he did not participate in Pontchartrain's shoreside activities and took his orders from Favre, the spud barge captain; (2) he participated in seagoing activities because he worked over water on the barges and sometimes had to get to them by towboat; and (3) he routinely performed a variety of tasks on the vessels such as tying off the barges, cleaning them, and fueling and greasing equipment, in addition to his unloading work.[38]

Pontchartrain replies, arguing that Rutherford failed to present any genuine dispute of material fact that precludes a ruling in Pontchartrain's favor on the seaman status issue.[39]  Citing *Sanchez*, *Meaux*, *Bouton v. Manson Construction Co.*, 2023 WL 8480070 (W.D. La. Dec. 7, 2023), and *Burton v. Weeks Marine, Inc.*, 2023 WL 8607016 (W.D. La. Dec. 12, 2023), Pontchartrain argues that the law clearly establishes that a person working aboard an unloading barge that is either spudded or tied down, and attached to shore by a gangplank, is not a seaman.[40]  Further, Pontchartrain points out that this Court held in *Meaux* that riding in a boat as a passenger to access

---

[35] R. Doc. 28 at 7-19.
[36] *Id.* at 8-9.
[37] *Id*. at 10-11.
[38] *Id.* at 11-19.
[39] R. Doc. 30 at 1-5.
[40] *Id.* at 2-3.

a barge worksite does not factor into the seaman-status analysis.[41]  In sum, Pontchartrain concludes that Rutherford is not a seaman because he was not employed to work on a vessel while it traversed a navigable waterway – and indeed, Rutherford submitted no evidence to show otherwise.[42]

## III.    LAW & ANALYSIS

### A.  Legal Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law identifies which facts are material. *Id.*  Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *EEOC*

[41] *Id.* at 4.
[42] *Id.* at 4-5.

6

*v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014).   Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).   In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence.  *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008).   Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).   Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial.  *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2).   Such facts must create more than "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.   When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden.  *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B).   Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted.  *See Little*, 37 F.3d at 1075-76.

**B.  Analysis**

Depending on the status of an injured worker and the allegedly responsible party, a maritime worker injured in the course and scope of his employment may bring an action under the Jones Act, the LHWCA, the general maritime law, or state law.  *See Chandris,* 515 U.S. at 355-56.  The Jones Act permits a "seaman injured in the course of employment ... to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104.  A Jones Act seaman may also bring a claim against his employer for maintenance and cure and unseaworthiness.  *See Becker v. Tidewater, Inc.,* 335 F.3d 376, 387 (5th Cir. 2003); *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015).  The LHWCA is a workers' compensation system and the exclusive remedy available to "a broad range of land-based maritime workers" who are injured in the course and scope of their employment but are not seaman and thus not entitled to sue under the Jones Act.  *Chandris*, 515 U.S. at 355 (citing 33 U.S.C. § 902(3)(G)).

The term "seaman" is not defined in the Jones Act.  *See* 46 U.S.C. § 30104*.*  A plaintiff must establish seaman status.  *Becker*, 335 F.3d at 390 n.8.  Determining "whether an injured worker is a seaman under the Jones Act is a mixed question of law and fact." *Id.* at 386.  "Though the Jones Act does not define 'seaman,' Congress has elsewhere defined it as the 'master or member of any crew of any vessel.'"  *Naquin v. Elevating Boats, L.L.C*., 744 F.3d 927, 932 (5th Cir. 2014) (citing *Chandris,* 515 U.S. at 355-56; 33 U.S.C. § 902(3)(G)), *overruled on other grounds by Sanchez*, 997 F.3d at 573.  However, not every "maritime worker on a ship at sea … is automatically a member of the crew of the vessel within the meaning of the statutory terms."  *Chandris*, 515 U.S. at 363.  Job title does not determine seaman status.  *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 558 (1997).  But seamen "owe their allegiance to a vessel and not solely to a land-based employer."  *Chandris*, 515 U.S. at 359 (quotation omitted).  The "inquiry is

fundamentally status based: Land-based maritime workers do not become seamen because they happen to be working aboard a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361. Moreover, "[i]n evaluating the employment-related connection of a maritime worker to a vessel in navigation, courts should not employ a 'snapshot' test for seaman status, inspecting only the situation as it exists at the instant of injury; a more enduring relationship is contemplated in the jurisprudence." *Id.* at 363 (quotation and citation omitted). "Thus, a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured." *Id.*

In *Chandris*, the Supreme Court established a two-part test for seaman status. First, the employee's duties must "contribute to the function of the vessel or to the accomplishment of its mission." *Id.* at 368. Satisfying this part of the seaman test is relatively easy because the individual "need only show that he does the ship's work." *Naquin,* 744 F.3d at 933 (quoting *Becker*, 335 F.3d at 387-88). "This threshold requirement is 'very broad,' encompassing 'all who work at sea in the service of a ship.'" *Becker*, 335 F.3d at 387-88 (quoting *Chandris*, 515 U.S. at 368).

Second, the employee "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its *duration* and its *nature*." *Chandris*, 515 U.S. at 368 (emphasis added). The claimed connection to a vessel or fleet of vessels must be "temporally, more than fleeting, and, substantively, more than incidental," because

> the fundamental purpose of the substantial connection requirement is "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea."

*Naquin*, 744 F.3d at 933 (quoting *Chandris*, 515 U.S. at 368).

"The duration of a worker's connection to a vessel and the nature of the worker's activities, taken together, determine whether a maritime employee is a seaman because the ultimate inquiry is whether the worker in question is a member of the vessel's crew or simply a land-based employee who happens to be working on the vessel at a given time." *Chandris,* 515 U.S. at 370. In determining the durational aspect of the vessel-connection requirement, the Supreme Court has adopted the Fifth Circuit's general rule of thumb that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id.* at 371. The Supreme Court explained that this figure:

> serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, the inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it.

*Id.* (quotation and citation omitted).

In determining whether an employee has a substantial connection to a vessel in navigation in terms of its nature, again, "it is not the employee's particular job that is determinative of seaman status, but the employee's connection to the vessel." *In re Endeavor Marine, Inc.*, 234 F.3d 287, 291 (5th Cir. 2000) (quoting *Chandris*, 515 U.S. at 364), *abrogated by Sanchez*, 997 F.3d at 573. Until *Sanchez*, an employee would qualify for seaman status if the employee's connection to a vessel "regularly exposes him to the perils of the sea." *Id.* (explaining *Papai*, 520 U.S. at 554-55). Further, an employee would still be deemed exposed to the perils of the sea despite limited experience in the open water; therefore, workers involved in a vessel's work near shore "still remain exposed to the perils of a maritime work environment." *Naquin*, 744 F.3d at 934 (rejecting "the categorical assertion that workers who spend their time aboard vessels near the shore do not face maritime perils").

10

In *Sanchez*, the Fifth Circuit, sitting en banc, expressly overruled the panel decision in *Naquin* and called into question the panel decision in *Endeavor Marine* to the extent they held that the nature prong of the *Chandris* test was satisfied simply by the plaintiff's exposure to the "perils of the sea," without requiring more. *Sanchez*, 997 F.3d at 573. In the wake of *Sanchez*, courts examining the nature of a putative Jones Act seaman's connection to a vessel must make the following "additional inquiries" – that is to say, in addition to asking whether a worker was subject to the perils of the sea, courts must ask:

> (1) Does the worker owe his allegiance to the vessel rather than simply to a shoreside employer?
>
> (2) Is the work sea-based or [does it] involve seagoing activity?
>
> (3) (a) Is the worker's assignment to a vessel limited to performance of a discrete task after which the worker's connection to the vessel ends, or (b) Does the worker's assignment include sailing with the vessel from port to port or location to location?

*Id.* at 574.

The facts of this case are very similar to those of *Meaux* where this Court ultimately held that the plaintiff was not a Jones Act seaman. *Meaux*, 601 F. Supp. 3d at 43-54. In *Meaux*, the plaintiff was employed by Savard Marine Services, Inc. d/b/a Savard Labor & Maritime Personnel, Inc. ("Savard") to work for Cooper Consolidated, LLC ("Cooper") as a borrowed employee pursuant to a staffing agreement. *Id.* at 41-42. Cooper's operations consisted of loading and unloading large, oceangoing cargo vessels midstream in the Mississippi River at three separate work locations. To perform this work, Cooper owned and operated a fleet of floating derrick crane barges that were brought by tugboat alongside the cargo vessels, which were moored to buoys midstream in the Mississippi River. *Id.* at 43-44. Cooper assigned certain workers, who were either full-time Cooper employees or employees hired through a union hall, to work aboard each

crane barge as a crew consisting of a crane operator, oiler, and deckhand.  *Id.* at 44.  Cooper also assigned other workers, who were hired through staffing companies like Savard, to so-called "longshore crews," which consisted of a "flag person" (or flagger), "utility person," and "equipment operator" to assist with Cooper's cargo operations.  *Id.*  Their work was typically done aboard the larger, oceangoing cargo vessels that were being loaded and unloaded.  *Id.*  The plaintiff was a flagger and utility man who was usually positioned aboard the oceangoing vessels that were being unloaded or the barges containing cargo  that was being loaded onto the oceangoing vessels. *Id.* at 45.  Cooper controlled the plaintiff's work, he drove to and from work every day, and he did not sleep on any vessel.  *Id.*  The plaintiff rode crew boats to the worksites, but never performed any work aboard the transport vessels while he was a passenger.  *Id.* at 47.

In *Meaux,* this Court considered the issue of the plaintiff's seaman status four times.  On the fourth occasion, with the benefit of a bench trial and a more fully developed factual record, the Court held that the plaintiff was not a seaman because the evidence showed that he did not engage in sea-based or seagoing activity and did not sail with Cooper's vessels.  *Id.* at 51-54.  While acknowledging that the plaintiff worked midstream in the Mississippi River and took a crew boat to get to his worksite, this Court concluded that:

> Boarding a crew boat to get to work is not seagoing activity; nor is performing longshore work near or around water.  Otherwise, scores of maritime workers would be transformed into Jones Act seamen who the law currently does not recognize as such.  As this Court previously observed, Meaux would certainly not be categorized as a seaman if the vessel being loaded and on which he worked was dockside.  Simply put, it cannot be said that Meaux's duties took him to sea in the way *Sanchez* envisions to allow his work to be considered sea-based or its nature seagoing activity.

*Id.* at 54 (citing *Meaux v. Cooper Consol., LLC*, 545 F. Supp. 3d 383, 390 (E.D. La. 2021)).  As to the third *Sanchez* inquiry – namely, whether the plaintiff's assignment included sailing with the crane barges from port to port or location to location – this Court noted that there was no evidence

that the plaintiff sailed with Cooper's crane barges from cargo-handling location to cargo-handling location, nor that he did any work on the crane barges or the crew boats while they were in transit. *Id.* And, finally, "at the end of the [work] day, [the plaintiff] would take the crew boat to shore and he would go home like any other longshoreman." *Id.*

The same holds true here. Even if Rutherford satisfies all the other prongs of the seaman-status test,[43] he is not a Jones Act seaman because he did not engage in sea-based or seagoing activity and did not sail with Pontchartrain's vessels. This case does not present as close of a call as did *Meaux*. Here, the undisputed evidence shows that Rutherford nearly always worked on vessels that were only a gangplank away from shore. His work was performed on the third-party-owned material barges that were tied off to the spud barges that were in turn almost always located near shore, and he never worked on any vessel while it was in motion. This Court simply cannot find that Rutherford was a seaman when his work had him even closer to shore than the plaintiff in *Meaux*. Throughout all the iterations of *Meaux*, this Court held fast to the notion that the plaintiff there certainly would not have been a seaman if he were merely a gangplank away from shore. The factual distinctions between *Meaux* and this case weigh more heavily against seaman status for Rutherford. In short, Rutherford was a longshoreman, not a Jones Act seaman. Thus, his Jones Act negligence, unseaworthiness, maintenance and cure, and punitive damages claims must be dismissed.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Pontchartrain's motion for summary judgment on seaman status (R. Doc. 19) is GRANTED, and Rutherford's Jones Act negligence, unseaworthiness, maintenance

---

[43] Although Pontchartrain will undoubtedly take issue with the validity of this assumption, the Court need not and does not decide these questions to resolve the motion.

and cure, and punitive damages claims are DISMISSED WITH PREJUDICE. This leaves Rutherford with only the claim he purports to assert under the LHWCA.

New Orleans, Louisiana, this 3rd day of May, 2024.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE